IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 07-00302 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTION TO |
| vs. | ) | SUPPRESS |
| | ) | |
| EDWARD HALL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING MOTION TO SUPPRESS

I.      INTRODUCTION.

Defendant Edward Hall is charged in a one-count indictment with violating 26 U.S.C. § 5861(d) by possessing a firearm that was not registered to him in the National Firearms Registration and Transfer Record.  See Indictment (June 20, 2007).

On April 1, 2008, Hall filed a motion to suppress evidence and statements arising out of the search of his residence and the seizure of the firearm.  See Motion to Suppress Evidence/Statements (Apr. 1, 2008) (Docket No. 55).  Hall was arrested outside of his house on May 22, 2007.  At that time, he was not wearing a shirt and asked whether he could go back into his house to get and put on a shirt.  One officer accompanied Hall into the house through a door in the garage to get the shirt, while other officers covered the back and front of the house to prevent Hall from attempting to escape.  While at the back of the house, an officer looked through a screen door and

saw the rifle that forms the basis of the Indictment.  Because the officers had valid consent to enter the house and seize the rifle, the motion to suppress is denied.

II.     FACTUAL BACKGROUND.

This court received oral testimony on Thursday, April 24, 2008.  In an effort to rule promptly on the merits and to avoid the burden on the court's over-extended court reporters, the court did not request and therefore does not have final transcripts of the live testimony, although the court has reviewed "rough" unedited copies of those transcripts.  Therefore, in referring to that testimony in these findings of fact, this court is unable to give exact page and line citations to the testimony.  Based on the live testimony and the exhibit received in evidence, the court finds the following by a preponderance of the evidence.[1]

A.   Hawaii County Police Department Officers Bruce Tyrin and Brian Markham, testifying for the Government, were the only witnesses at the hearing.  Having observed the manner and heard the substance of their testimony, the court finds Officers Tyrin and Markham credible.

B.   In the late afternoon of May 22, 2007, the Hawaii County Police Department received a domestic dispute call from

---

[1] For ease of reference in possible later proceedings, the court uses alphabet letters to label its findings of fact and conclusions of law.

Hall's girlfriend, Normalin Williams. Officers Tyrin, Markham, and William Derr responded to the call. See Tyrin Test. This was not the first time that officers had responded to domestic disputes between Hall and Williams. See Markham Test. As Officer Derr told Officer Markham that day, he did not want to keep going to Williams's home and knew that Hall had once taken a wooden baton from an officer and thrown it into the bushes. See Markham Test.

      C.   The relevant events for purposes of this motion took place at two adjacent houses. See Tyrin Test. In furtherance of the E-Government Act, the court identifies these houses only as the -87 and -83 houses.

      D.   Officer Tyrin went to the -87 house. Williams was standing in the middle of the road in front of that house. She told Officer Tyrin that she had just been involved in a domestic dispute with Hall and that Hall was at her other residence, the -83 house. See Tyrin Test.

      E.   Officer Tyrin walked with Williams to the -83 house. See Tyrin Test. Meanwhile, Officer Markham, who had gone straight to the -83 house to talk with Hall to get his side of the story, saw Hall come out of the -83 house through a garage door. See Markham Test.; Tyrin Test.

      F.   Standing outside the -83 house, the officers told Hall that they were going to take him to the police station,

given the domestic dispute complaint.  Hall had also allegedly damaged Williams's car and threatened to shoot her.  Dressed in only shorts and sandals, Hall asked the officers if he could go into the -83 house to get a t-shirt.  <u>See</u> Tyrin Test.; Markham Test.

  G. The officers agreed that Hall could go into his house to retrieve a shirt.  As part of normal police procedure, Officer Tyrin asked Officer Markham to cover the back exit to the house just in case Hall, who had previously had a confrontation with law enforcement officials, decided to run or otherwise resist arrest.  Officer Derr then went to cover the front door of the house on his own initiative.  Officer Tyrin accompanied Hall into the home through the garage door to monitor him.  Although Officer Tyrin could not see into every room in the -83 house, he had no reason to think anyone else was in the house.  <u>See</u> Tyrin Test.

  H. From the entryway, Officer Tyrin watched Hall walk down a hallway to get a shirt.  Hall put on the shirt and returned outside.  <u>See</u> Tyrin Test.

  I. While Hall was walking into the -83 house to get a shirt, Officer Markham walked around to the back of the house to prevent possible escape.  Looking through an open glass door in the back of the house and through a closed screen door to try to catch sight of Hall or Officer Tyrin, Officer Markham saw a rifle

on the floor about two to three feet from the back door. Officer Markham did not catch sight of Hall or Officer Tyrin in the house and did not try to enter the house or open the screen door. Instead, hearing Officer Tyrin and Hall at the front of the house where they had returned, Officer Markham joined them at the front. <u>See</u> Markham Test.

  J. By this time, a police transport car had arrived. Handcuffed, Hall was taken by other police personnel in the transport car to the Kea`au Police Station. <u>See</u> Tyrin Test. Officer Markham, who had not left the scene, then told Officer Tyrin that he had seen what he believed was a firearm on the floor in the kitchen. <u>See</u> Tyrin Test.

  K. Concerned by Williams's report of Hall's threat to get released on bail and to come back to shoot her, the officers asked Williams for consent to go into the house to see whether there was indeed a firearm in it and to retrieve that firearm. The officers and Williams were standing outside the -83 house at the time.

  L. Williams, who had described herself as the owner of both the -87 house and the -83 house and as a resident at both houses, had shown the officers documents showing her ownership of both properties. She consented orally to the officers' entry, but there was no evidence that either the request for oral consent or the consent itself expressly referred to the -83

5

house, as opposed to the -87 house.  Nevertheless, given the officers' location outside the -83 house at the time and the officers' reference to a firearm in the -83 house, the court infers that the house Williams orally consented to having the officers enter and search was the -83 house.  See Tyrin Test.; Markham Test.

   M. After obtaining Williams's oral consent, the officers entered the -83 house and retrieved the rifle.  See Tyrin Test.  The officers then went to the -87 house with Williams, where she signed the standard written consent form introduced at the hearing as Exhibit 1.  Officer Tyrin went through this form with Williams line-by-line but neglected to fill in or have her fill in the portion of the form that asked for a description of the property that Williams was agreeing could be searched.  See Tyrin Test.; Exhibit 1.

   N. Officer Markham testified that he actually searched both the -87 and -83 houses.

II.  THE MOTION TO SUPPRESS IS DENIED.

   Hall now moves to suppress the rifle and the statements he made at the police station.  Hall argues that the rifle is the product of an illegal warrantless search.  Hall also argues that his statements should be suppressed because "all evidence obtained as a result of an illegal search must be suppressed."

Because the search of the -83 house and the seizure of the rifle did not violate the Fourth Amendment, the motion is denied.

A. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has held that "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (emphasis in original) (internal quotation marks omitted). Because Officer Markham did not have a warrant to go into the back yard of the -83 house, the Government must show an exception to the rule that warrantless searches and seizures are per se unreasonable.

B. The Government argues that the plain view exception applies because Officer Markham saw the rifle in plain view from the patio area in the back of the house. The plain view exception "permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." Washington v. Chrisman, 455 U.S. 1, 5-6 (1982).

C. Given the testimony of Officers Tyrin and Markham, it is unclear whether the rifle was incriminating evidence or

contraband such that the "plain view" doctrine is applicable. The existence of the rifle itself did not cause the officers to think that a crime with respect to the rifle had been committed. For example, the officers did not testify that they knew Hall was a felon and therefore was not allowed to be in possession of the rifle. Nor did they testify that they knew that he did not have a firearm registered to him or that there was a violation of a state statute with respect to the manner that the rifle was being stored in the house. Instead, the officers appear to have been relying on section 134-7.5 of the Hawaii Revised Statutes in seizing the rifle to prevent Hall from carrying out his alleged threat of shooting Williams.[2] This court need not decide whether that state law justified the officers' entry into the house after Officer Markham saw the rifle or whether that state law is consistent with the Fourth Amendment, because the officers had consent to search the -83 house.

---

[2] In relevant part, section 134-7.5(a) states:

> Any police officer who has reasonable grounds to believe that a person has recently assaulted or threatened to assault a family or household member may seize all firearms and ammunition that the police officer has reasonable grounds to believe were used or threatened to be used in the commission of the offense. The police officer may seize any firearms or ammunition that are in plain view of the officer or were discovered pursuant to a consensual search, as necessary for the protection of the officer or any family or household member.

D.  As an initial matter, the officers' knowledge of the existence of the rifle was not obtained in violation of the Fourth Amendment.  In <u>Chrisman</u>, 455 U.S. 1, for example, an officer stopped the defendant, who appeared to be a minor in possession of alcohol.  The defendant asked to be allowed to go to his dormitory room to get his identification.  The officer agreed.  While watching the defendant from a doorway, the officer saw a pipe and marijuana seeds, which he seized.  The Washington Supreme Court held that the officer "had no right to enter the room or seize the contraband without a warrant." <u>Chrisman</u>, 455 U.S. at 5.  The United States Supreme Court reversed, reasoning that "it is not 'unreasonable' under the Fourth Amendment for a police officer . . . to monitor the movements of an arrested person, <u>as his judgment dictates</u>, following the arrest." <u>Id.</u> at 7 (emphasis added).  In so holding, the Supreme Court noted that, even if there was little chance that the defendant could escape from his dormitory room, "the arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation." <u>Id.</u>  The Ninth Circuit has interpreted <u>Chrisman</u> as allowing officers to accompany a defendant into his home at the defendant's request. See <u>Unites States v. Chase</u>, 692 F.2d 69, 71 (9th Cir. 1982) ("Once they had him detained in the

front yard and he requested to go back into the house, the officers could stay at his elbow.").

   E. Here, however, Officer Tyrin, the officer who accompanied Hall into the house, was not the officer who saw the rifle.  Instead, Officer Markham saw the rifle when he went to the back of the house to prevent a possible escape.  Officer Markham acted reasonably in going to the back of the house, especially as he had heard of a previous confrontation Hall had had with police.  In having Officer Markham go to the back of the house, Officers Tyrin and Markham were exercising reasonable judgment in monitoring Hall following his arrest.  See Chrisman, 455 U.S. at 7.

   F. Officer Markham was constitutionally allowed to be in the place that gave him the knowledge of the existence of the rifle.  From his position in the back yard, he saw the rifle, mush as a hypothetical officer might overhear someone inside a house talking about a rifle.  Because Officer Markham was justified in being where he was, the knowledge gained just by being there was not wrongfully gained. Williams's subsequent consent to the officers' entry into the home and seizure of the gun justified their search of the -83 house.  "A search conducted pursuant to valid consent is an exception to the fourth amendment's warrant and probable cause requirements." United States v. Huffhines, 967 F.2d 314, 318 (9th Cir. 1992).  "The

existence of consent to search is not lightly to be inferred, and is a question of fact to be determined from the totality of the circumstances." United States v. Patacchia, 602 F.2d 218, 219 (9th Cir. 1979).

      G.   In relying on Williams's consent, the officers were not relying on a mere landlord's consent to search a tenant's home. A landlord generally may not give consent to a search of a dwelling rented to another. See Chapman v. United States, 365 U.S. 610, 616-17 (1961). Williams, however, told the officers that she owned and lived in both the -83 and -87 houses. Consent may be given by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). The United States Supreme Court has explained that:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 993 n.7.

H.  Williams demonstrated to the officers that she had common authority to consent to the search as a co-inhabitant, not a mere landlord.  Williams's consent to search the -83 house therefore justified the officers' warrantless search of it.

I.  The court is unpersuaded by Hall's argument that Williams did not adequately consent to the search of the -83 house.  Although the written consent to search (Exhibit 1) did not identify the -83 house as the place Williams was consenting to have searched, that written consent was executed after the gun was retrieved from the -83 house.  The officers had earlier received valid and voluntary oral consent to search the -83 house.  In response to Hall's alleged threats to Williams that he would shoot her after he made bail, the officers, while standing in front of the -83 house, asked Williams for consent to go into the house to get the rifle.  It was in that context that Williams consented.

J.  Whether the written consent to search described the property has no impact on Williams's earlier oral consent to search the -83 house.  See United States v. Lattimore, 87 F.3d 647, 651-52 (4th Cir. 1996) (oral consent justified a search despite the defendant's later refusal to sign a written consent form); United States v. Gutierrez-Mederos, 965 F.2d 800, 803 (9th Cir. 1992) (upholding a search based on oral consent given voluntarily); United States v. Medley, 2006 WL 3247200, 9 (E.D.

Mo. Nov. 8, 2006) ("The officers did not need a signed written consent to search form as long as they had received oral consent."). It is also reasonable to infer that, because Williams signed the consent form after the gun was seized from the -83 house, Williams meant for her written consent to support the oral consent she had given the officers to enter the -83 house and seize the rifle.

K.   The result here does not conflict with the Supreme Court's ruling in Georgia v. Randolph, 547 U.S. 103 (2006). In Randolph, the Supreme Court held that police may not enter a dwelling when one occupant consents but another who is present at the dwelling tells the police that they may not enter. Reliance on the consent of one of the occupants is unreasonable in light of known objections by the other occupant. Id. at 122-23. Here, nothing in the record indicates that Hall objected. To the contrary, he allowed Officer Tyrin to go with him into the -83 house. Nor was Hall removed from the -83 house to prevent him from objecting to a search pursuant to Williams's consent. See id. at 121-22. Given Williams's consent, the court is unpersuaded by Hall's assertion that the officers should have secured the house and obtained a warrant before entering it.

L.   Although not raised at the hearing on the present motion, the Government argued in its Opposition that, because Hall was arrested, the seizure of the rifle was justified based

on the search-incident-to-a-lawful-arrest doctrine.  It is well settled that a s search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.  See United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996) ("A 'search incident to arrest' is an exception to the general rule against warrantless searches").  A warrantless search is justified by law enforcement officers' need to seize weapons or other things that might be used to assault officers or effect an escape, as well as the need to prevent the loss or destruction of evidence.  See Hudson, 100 F.3d at 1419.

M.  A legitimate "search incident to arrest" is limited to the arrestee's person and to the area "within his immediate control," meaning "the area from within which he might gain possession of a weapon or destructible evidence."  Chimel v. California, 395 U.S. 752, 763 (1969).  The Ninth Circuit has therefore limited the scope of the search incident to arrest doctrine to "encompass a room from which the arrestee has been removed."  Hudson, 100 F.3d at 1419 (quotations omitted).  Here, Hall was arrested outside and escorted to an area of the house that was not the room in which the rifle was found.  Under these circumstances, the search for the rifle was not a search incident to a lawful arrest.  See United States v. Cooper, 433 F. Supp. 2d 737 (S.D. W. Va. 2006) (holding that an arrest of a person

outside of a house did not give officers the authority to enter a house and conduct a search for a weapon as a search incident to a lawful arrest). The search-incident-to-a-lawful-arrest doctrine is inapplicable, and the court does not rely on that doctrine as justifying a search that was instead reasonable because of Williams's consent.

III.     CONCLUSION.

For the foregoing reasons, Hall's motion to suppress is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 30, 2008.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

United States of America v. Hall, Crim. No. CRIM. NO. 07-00302 SOM; ORDER DENYING MOTION TO SUPPRESS